**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 19-cv-23914-GAYLES/OTAZO-REYES**

RONALD EMILIO REYNA, M.D.,
PROFESSIONAL ASSOCIATION, a Florida
corporation (o/b/o JOHN DOE 8),

    Plaintiff,

v.

CELTIC INSURANCE COMPANY d/b/a
AMBETTER FROM SUNSHINE HEALTH, a
foreign corporation,

    Defendant.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
***DAUBERT* MOTION TO BAR OPINIONS OF JEAN ACEVEDO**

Plaintiff, Ronald Emilio Reyna, M.D. P.A. o/b/o John Doe 8, hereby responds in opposition to Defendant Celtic Insurance Company's *Daubert* Motion to Bar Opinions of Jean Acevedo ("Defendant's Motion" or "the Motion"), and states as follows:

LEGAL STANDARD

*Daubert* is a very permissive standard, notwithstanding Defendant's recitation about what Defendant believes will confuse the jury, and despite that Defendant's expert is no less conclusive than Ms. Acevedo is accused of being. *See, infra.* This permissiveness is because Rule 702 only relies on three inquiries: (i) is the expert qualified; (ii) is the methodology used by the expert sufficiently reliable; and (iii) does the expert's testimony help the jury determine a contested fact or understand contested evidence?

> Defendants' *Daubert* challenge fails largely for the same reasons. As we explained in *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548 (11th Cir. 1998), for expert testimony to be admissible under Rule 702 of the Federal Rules of Evidence, the proponent of the testimony must show that: **(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.** *Id.* at 563 (citing *Daubert,* 509 U.S. at 589, 113 S. Ct. at 2794). *Daubert* **itself stresses that "[t]he inquiry envisioned by Rule 702 is ... a flexible one."** *Id.* **at 594, 113 S. Ct. at 2797. "Many factors will bear on the inquiry, and [there is no] definitive checklist or test."** *Id.* at 593, 113 S. Ct. at 2796.

*Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)(emphasis added).

Debatable expert testimony should not be kept out of court. The rigors of the adversary system, allowing juries to evaluate expert opinions in the light of how they are instructed, and a rigorous cross examination, allow debatable testimony to be properly admitted.

> A district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan,* 184 F.3d 1300, 1311 (11th Cir. 1999). " 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.' " *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S. Ct. at 2786).

*Id.* at 666.

Furthermore, a disagreement as to what factors were, and were not, included in expert analysis, such as in the instant action, disagreement about inclusion of the amounts paid in the community, not only rates billed, is probative of reliability, not admissibility.

> Indeed, in summarizing several of its arguments as to reliability, Quiet says that "Frank's failure to include all available flight test parameters in his model is fatal to any meaningful correlation of flight test results with computer results...." **Yet the Supreme Court has explicitly rejected the same argument in a different substantive context, holding that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility."** *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S. Ct. 3000, 3009, 92 L.Ed.2d 315 (1986).

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003).

2

Hence, a dispute over what factors were, and were not, considered in an expert's opinion, or report, does not affect admissibility, because the purpose of vigorous cross examination and proper jury instruction is to allow the jury to decide the weight of the testimony in light of the factors both considered and not considered in the expert's opinion.

> Further, **"it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."** *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz,* 253 F.3d at 666 (**"A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury."** (internal quotation marks omitted)). "Quite the contrary, **'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"** *Quiet Tech.,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596, 113 S. Ct. at 2798). Indeed, **"in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility."** *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188 (9th Cir. 2002). *See also Quiet Tech.,* 326 F.3d at 1345 (noting that **"[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility"** (quoting *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S. Ct. 3000, 3009, 92 L.Ed.2d 315 (1986))).

*Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011).

Therefore, the standard for the admissibility of testimony, versus the weight it should be given because it is based on one factor versus another, are different inquiries. Defendant mainly argues that the testimony is inadmissible because the opinions do not conform to what Defendant claims are the right standards or use what Defendant claims are the right considerations. While Defendant is entirely wrong, these are arguments that go towards the weight the jury should give to the opinions, which will be established through the rigorous adversarial trial process.

<u>RESPONSES IN OPPOSITION TO DEFENDANT'S NUMBERS ONE THROUGH FIVE</u>

First, Defendant does not question whether Ms. Acevedo is qualified to tender an opinion, by reason of training, experience, education, or any other factor relevant to the first inquiry under Fed. R. Ev. 702. Hence, the first element of the inquiry under Fed. R. Ev. 702 is satisfied.

3

*I: Defendant's Argument That All Material Evaluated Was Not Turned Over is Fatally Flawed*

The FAIR Health data Ms. Acevedo considered was controlling of her opinion as to the relevant UCR range for each billed code. Ms. Acevedo did check the accuracy of this information, as to Miami-Dade County, by verifying other charges from other similar client files. This, however, was merely to check the accuracy of the tool she was using. It was not a tool she used to establish the UCR range in her expert opinion. In other words, Ms. Acevedo verified the accuracy of the data set used by using the other files to check the calibration of the data set she relied on. Calibration is calibration; it ensures a tool is accurate, but the tool does all the work.

Picture Ms. Acevedo as a baker who was following a recipe for chocolate cake from Betty Crocker. Before starting to bake, she compared the Betty Crocker recipe to a recipe for chocolate cake from Costco to make sure that Betty Crocker was not in the wrong kitchen, so to speak, listing random amounts of butter in its recipe. Reviewing Costco's recipe confirmed that there was a similar amount of butter to bake a cake, as Betty Crocker claimed. So, to bake the cake, Ms. Acevedo exclusively followed the Betty Crocker recipe. Once the cake was ready, the recipe having been followed, the cake tasted great, if someone asked for the recipe, Ms. Acevedo logically would give that person the Betty Crocker recipe. Costco's recipe was used only to verify that Betty Crocker was not in the wrong kitchen, making things up. Hence, giving out Costco's recipe would not be relevant, nor logical, because that was not the recipe used to make the cake.

Ms. Acevedo referred to other files to confirm the recipe she was using, the FAIR Health data, was not baseless, similar to checking the Betty Crocker recipe against the Costco recipe regarding the amount of butter. The patient file charges that Ms. Acevedo referenced were used simply to make sure the FAIR Health data was in the right "kitchen." Once that was verified, the FAIR Health data was the basis of Ms. Acevedo's opinion.

4

Neither the Costco recipe, nor the patient file charges, were relevant to the result of the cake or the calculation of the UCR range. The patient files were used to make sure that the FAIR Health data was not completely off. If Defendant believes the FAIR Health data is off, then Defendant may challenge the propriety of the FAIR Health data during cross-examination at trial. This is the purpose of cross examination. Defendant is in no way prejudiced by the failure to produce the calibration tool, when it was only used to confirm that the FAIR Health data was sound. The Costco recipe would not be relevant for the purpose of baking a cake using the Betty Crocker recipe, just like the patient files, which are simply not relevant to Ms. Acevedo's opinion.

Furthermore, Ms. Acevedo could not produce the files that she used for calibration due to HIPAA regulations. Ms. Acevedo cannot just turn over unrelated, random patient files to Defendant as they contain protected health information on medical treatment of unrelated patients and are protected by law.

Defendant's argument is simply nonsensical. The gist of Defendant's argument is that unrelated patients' files should be turned over in this litigation, violating the HIPAA and Florida statutory rights of those non-party patients, who have nothing to do with the litigation. The implication is that third-party medical information should be freely shared, when it is neither relevant nor necessary, and in violation of HIPAA and Florida's more stringent requirements. *See* § 456.057(7), Fla. Stat. (None of the statutory exceptions that would allow disclosure without the patient's written authorization apply here.) The initiation of one action for underpayment, involving one patient file, should not abrogate the HIPAA and Florida statutory protections afforded to unrelated parties to the litigation.

*II: Ms. Acevedo's Opinions Are Helpful to the Jury, not Confusing*

Most importantly, for ACA purposes, the federal government defines UCR as the usual, customary and reasonable rate, "The amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service. The UCR amount sometimes is used to determine the allowable amount." https://www.healthcare.gov/glossary/ucr-usual-customary-and-reasonable/.

Defendant mistakenly relies on *Baker County Med. Serv. Inc. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842, 845 (Fla. 1st DCA 2010). Defendant proclaims again and again that the ACA is unique, and that as an ACA provider, Defendant is unique and must follow the strictures of the ACA itself. This, of course, would necessarily include relying on the definition of the UCR provided in connection with the ACA. This is the definition used by Ms. Acevedo, and it is proper under both state payor laws and the ACA. Defendant cannot both claim it is unique for having to follow the strictures of the ACA to protect the public coffers, and then ignore the ACA definition of UCR in favor of an outlier opinion decided before the ACA was enacted.

With all due respect to the Florida First District Court of Appeal, its decision does not comport with the plain language of the statute and reads into the statute the opposite of what was drafted. This exceeds the First DCA's authority. Rules of statutory interpretation are not necessary, nor called for, nor are alternative meanings, when the words of the statute are clear and unambiguous, as they are in this instance. *See, infra.*

The language at issue is from Florida Statute § 641.513, which states, "the usual and customary **provider charges** for similar services in the community where the services were performed." The key here is the words "provider charges." The statute does not say fair market value, nor does it say the amount that was paid. The statute restricts the definition to "provider

6

charges." The words "fair market value," are nowhere mentioned in the statute. The plain meaning of "provider charges," is in no way ambiguous.

> [W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.

*GTC, Inc. v. Edgar*, 967 So. 2d 781, 785 (Fla. 2007).

> Courts are not free, and may not elect, to adopt other interpretations of statutory language and expand the reach of a statute merely because some might find it desirable.

*Edison v. Douberly*, 604 F.3d 1307, 1309 (11th Cir. 2010).

In other words, the *Baker County* court decided to apply the rules of statutory construction to Florida Statute § 641.513, though no such analysis should have taken place because the term "provider charges" is unambiguous. *See, supra.* The *Baker County* court incorrectly expands these words to equal fair market value when that is not what the statute plainly says. *See, supra.* Furthermore, the First DCA's flawed interpretation ignores the federal definition of UCR as found on the healthcare.gov website to be applied to ACA policies. The federal language is mirrored in the Florida statute, and, thus, clearly, not ambiguous.

The words "provider charges" are as unambiguous as "Publix charges". If one is buying a loaf of bread, the question is not what the fair market value of the loaf of bread is. If asked what Publix charges, the relevant answer is "whole wheat is $2.99 a loaf" or that the price of a loaf of bread generally in the local community is $2.99 a loaf.

The First Circuit in *Baker County* improperly expands the meaning of the statute to include things other than "provider charges," such as amounts paid. However, factors outside of what are the "provider charges" are as relevant as if one asked what Publix charges for a loaf of bread, and the answer is that "your neighbor will not pay $2.99 for a loaf of bread." The fact that your

7

neighbor will not pay $2.99 bears no relevance to the fact that Publix charges $2.99 or that that the price of a loaf of bread in the local community is $2.99.

This Court is not bound by *Baker County*. The Court should give deference to the federal government's definition of the UCR under the ACA, the plain meaning in the statute, and not an incorrect expansion of the definition of the UCR by one state appellate court. *See, supra.*

The question of what rate is usual, customary, and reasonable in the community, is one ultimately to be determined by the jury, and same is to be established through the rigorous examination of both parties' experts. Plaintiff's expert should not be excluded because Ms. Acevedo used the proper definition of the UCR under the ACA.

*III: Ms. Acevedo's Testimony Is Not Conclusive, But Probative*

Opining on the UCR is what the respective expert witnesses were retained to do for both parties. Defendant's third argument is a bootstrap argument, but the strap is broken because Defendant's argument applies equally to both experts. Further, if the jury is properly instructed, then the jury will be aware of its role as the ultimate arbiter of the UCR rate. Hence, Defendant's argument is completely without merit.

*IV: Ms. Acevedo's Opinions Are Reliable*

Defendant's fourth argument reads like a repeat of Defendant's second argument. Defendant again argues that more factors should have gone into the calculation of the UCR rate than Ms. Acevedo considered. This is not a persuasive argument, however, because the federal definition of UCR under the ACA says that provider charges are the only factor used in calculating the UCR rate. This is what the FAIR Health website provides and is the basis of Ms. Acevedo's expert opinion. The gatekeeping function of the Court is satisfied, in that the Court can be sure

Ms. Acevedo's opinions are based on the UCR rate, as it is defined by the ACA, and calculated by a reliable source, FAIR Health.

Furthermore, as illuminated above, the inclusion or non-inclusion of factors in expert testimony goes to the weight of the expert testimony, not its admissibility. *See Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003), *supra*. The fact that Defendant believes that other data should have been used from the FAIR Health website is something that Defendant can cross examine Ms. Acevedo about, and the jury can weigh. Ms. Acevedo's testimony is relevant to determining the UCR rate, and it is reliable as it is based on provider charge information compiled by a commonly relied upon source, which is relevant as it is a central issue.

The fact that the website, itself, says it is not reflective of the UCR, but that it is a tool to determine same, is exactly why there is an expert to help interpret that information. The jury will ultimately determine the UCR rate. But the jury will not have technical or specialized knowledge sufficient to determine UCR without the assistance of expert testimony. Hence, the three-pronged test under Daubert is satisfied. Ms. Acevedo's qualifications were never in doubt, the methodology was to analyze provider charges from a reliable source, and the jury will be assisted by the expert's analysis.

Through the process of rigorous cross examination, Defendant may question every factor used or not used by Plaintiff's expert, and Plaintiff may do the same as to what factors were used or not used by Defendant's expert. This is how the system is supposed to work. It favors admissibility of evidence and letting the jury decide what weight to give to it, after it has been vetted through the adversarial process. *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001), *supra*.

The fact that the FAIR Health website says that it does not establish the UCR rate refutes Defendant's last argument. If the FAIR Health website does not "establish" the UCR rate, then the jury can, as it is supposed to. And Ms. Acevedo's expert testimony can assist the jury with this task.

The fact that the FAIR Health website does disclaim itself as only representing the amount billed, not the amounts accepted, means that it comports with the definition of the UCR found in the healthcare.gov website, which governs the ACA. Hence, this source considered in developing Ms. Acevedo's expert opinion could not be more reliable as it gives the UCR range as defined under the ACA.

In trying to exclude the testimony, Defendant misses the point of the adversarial trial system. Defendant's expert is going to opine that the UCR was paid, and the Plaintiff's expert will opine otherwise. Which expert is more reliable, depending on what he or she considered to come to his or her conclusions, is a decision for the jury to make, after cross examination of both experts.

> We have repeatedly stressed *Daubert*'s teaching that the gatekeeping function under Rule 702 "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible evidence.*' " *United States v. Alabama Power Co.,* 730 F.3d 1278, 1282 (11th Cir.2013) (emphasis added) (quoting *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1311–12 (11th Cir.1999)).

*Adams v. Laboratory Corp. of Am.*, 760 F.3d 1322, 1334 (11th Cir. 2014)

The purpose of the Court is not to stand in the shoes of the jury, to determine one expert is more reliable than the other. Rather, the weight of the evidence is to be determined by the jury, and the sources considered, or not considered, are an issue for the jury to decide the validity of. *See id.* In other words, what sources were used, or considered, goes to probative value of the testimony, as evaluated by the jury, but does not affect admissibility. *See, supra.*

> This gatekeeping role, however, "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1311–12 (11th Cir.1999) (citing *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786).

*U.S. v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013).

*V: Ms. Acevedo's Opinions Have Probative Value and Will Aid, Not Confuse, the Jury*

Fundamentally, Defendant makes the same argument in its number five, as it does in Defendant's numbers two and four. The disagreement between the parties lies in whether they accept the First DCA's errant interpretation of the term UCR in the *Baker County* case, or the actual definition set forth under healthcare.gov and Florida statute. This is an argument that goes to the weight of the testimony, not its admissibility, as the jury should decide what ultimate rate of reimbursement Plaintiff is entitled to recover. Clearly, Ms. Acevedo and Defendant's expert will both play roles in helping the jury determine what factors to consider, and the jury will remain the ultimate arbiter of the appropriate calculation of UCR.

While claiming to be tightly federally regulated as an ACA policy, Defendant, for some reason, believes all of the rules of the ACA apply to Defendant, except the definition of UCR. Essentially, Defendant seeks to use its ACA Marketplace status as both a sword and a shield, selecting when it will claim that it is special and must follow all ACA guidelines, and when it can ignore the ACA, such as the ACA definition of the UCR.

If Defendant decided that it wished to abide by the ACA on all occasions, it would have to concede liability, because the ACA defines the UCR to be based on provider charges, not payor activity. An argument over liability and damages is exactly what a trial is, and these issues will ultimately be decided by a jury. Ms. Acevedo's testimony aids the jury in applying the federal definition of the UCR, while Defendant's expert will opine that several factors excluded by the

11

ACA definition from consideration of the UCR (such as Medicare reimbursement rates, for one), make Defendant not liable for damages. This is a healthy debate to have in front of a jury, in that it helps the jury determine the central issues in the instant action.

Even if one does not agree with Plaintiff that the First DCA in *Baker County* exceeded its authority by reading into the statute what is not there, Defendant argues in its third argument that what the UCR is should be left to the jury. That means the jury should weigh Ms. Acevedo's testimony, Defendant's expert's testimony, and use both to guide its decision of what the UCR is, and what factors to include. This is how the courts have consistently favored expert testimony working. *See, supra.*

> While the Court's gatekeeping function ensures that unreliable testimony does not reach the jury, the Court must not make determinations on the credibility or persuasiveness of the proffered opinions; "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

*Godelia v. Zoll Services, LLC*, 16-60471-CIV, 2019 WL 3934259, at *2 (S.D. Fla. Aug. 19, 2019).

## CONCLUSION

For the reasons set forth above, the Court should deny Defendant's Daubert Motion to Bar Opinions of Jean Acevedo.

Respectfully submitted,

/s/ *Cynthia Barnett Hibnick*
CYNTHIA BARNETT HIBNICK
Fla. Bar. No. 375705
cbh@lubellrosen.com
LORI A. SOCHIN
Fla. Bar. No. 13048
las@lubellrosen.com
JOSHUA H. SHESKIN
Fla. Bar. No. 93028
jhs@lubellrosen.com

LUBELL | ROSEN
1 Alhambra Plaza, Suite 1410
Coral Gables, Florida 33134
Telephone: (305) 655-3425
Facsimile: (305) 442-9047
*Attorneys for Plaintiff*